# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

LAWRENCE C. PADDOCK, SR. ET AL         CIVIL ACTION NO.

VERSUS         13-810-SDD-SCR

JONATHAN L. THURBER and
JAMES K. THURBER

## RULING

This matter is before the Court on the *Motion to Dismiss*[1] filed by Defendant James K. Thurber ("James Thurber" or "Defendant").[2]  Plaintiffs Lawrence C. Paddock, Sr. ("Paddock") and Thompson Creek Wealth Advisors, L.L.C. ("TCW") (or collectively "Plaintiffs") have filed an *Opposition*[3] to this motion.  For the reasons which follow, the Court finds that it has personal jurisdiction over the Defendant, and his motion should be denied.

## I.   FACTUAL & PROCEDURAL BACKGROUND

TCW is a fee only investment advisory firm which works with its clients to pursue their investment goals, and it is located in St. Francisville, Louisiana.  Plaintiffs allege that,

---

[1] Rec. Doc. No. 33.
[2] Defendant Jonathan L. Thurber has made no appearance in this case, and the Court granted a default judgment against him (Rec. Doc. No. 14) that was later vacated only as to co-Defendant James K. Thurber (Rec. Doc. No. 19).  The default judgment as to Jonathan Thurber remains in effect.
[3] Rec. Doc. No. 50.
35727

in November of 2010, one of TCW's clients sought an asset that would provide a fixed cash flow over time.  TCW refers to this client only as "Client."[4]  TCW claims that, through a broker, it learned that Jonathan L. Thurber and James K. Thurber were seeking to sell certain annuity payments owed to them.

It is alleged that the Client paid the broker $437,117.35 to acquire nine annual payments of $72,642.62, owned by James Thurber, to commence on February 1, 2011 through and including February 1, 2019.  It is further alleged that James Thurber received $437,117.35 less the broker's commission.   The assignment of payments was evidenced by an Assignment of Cash Flow from the annuity contracts.

Plaintiffs allege that Thurber failed to remit the February 2011 payment to the Client and offered several excuses for this failure.   Plaintiff Lance Paddock, Chief Executive Officer of TCW, purchased the Client's rights in the assignment payments through Paddock's self-directed IRA.  By assignment dated April 14, 2011, the Client assigned his rights and interests to the assignment payments to Paddock.

Plaintiffs claim that, over the next several months, Thurber continued to provide only excuses for the failure to direct the February 2011 payment to Paddock.   Thurber also allegedly requested a payout to reacquire the assignment payments after claiming that he was on the verge of receiving a large sum of money.  Plaintiffs claim that Thurber finally paid Paddock $25,000.00 on June 30, 2011, and another $38,000.00 on July 14, 2011, but failed to pay the remaining $7,167.56 owed for February 2011.

---

[4] Rec. Doc. No. 1, ¶ 6.  Plaintiffs allege they refer only to this client as "Client" to protect the client's privacy.
35727

Plaintiffs further allege that Thurber again failed to remit payment when the February 2012 payment came due, again with more excuses by Thurber and assurances that he could soon send the complete payout.  This pattern allegedly repeated again in February of 2013, at which point Paddock sent correspondence to Thurber on April 18, 2013 demanding that Thurber remit the unpaid portion of February 2011 and the February 2012 and 2013 payments in full within ten days.  Plaintiffs claim that, other than a $5,000.00 payment remitted in May of 2013, Thurber has failed to remit the remaining amounts owed to Paddock.

On December 18, 2013, Plaintiffs filed this lawsuit alleging breach of contract, fraud, and unjust enrichment by the Defendants and seeking specific performance and a declaratory judgment against Thurber.  After neither Defendant answered or otherwise appeared in this lawsuit, Plaintiffs moved for the Clerk's Entry of Default on January 16, 2014.[5]  The Clerk of Court for the Middle District of Louisiana entered default against the Defendants on January 17, 2014.[6]   Plaintiffs then moved for a default judgment by the Court on January 23, 2014.[7]  Following a March 20, 2014 hearing on this motion, the Court ultimately entered a *Default Judgment* against the Defendants on March 31, 2014.[8] More than a year later, on May 19, 2015, Defendant James K. Thurber moved to vacate the *Default Judgment* on the grounds that Plaintiffs failed to properly serve him.  Based on the record before the Court, this motion was granted, and the Court vacated the default

---

[5] Rec. Doc. No. 5.
[6] Rec. Doc. No. 6.
[7] Rec. Doc. No. 7.
[8] Rec. Doc. No. 14.
35727

judgment as to Defendant James K. Thurber only.[9]  The Court noted that co-Defendant Jonathan Thurber was not a party to the motion to vacate, and the default judgment was still in effect as to Jonathan Thurber.[10]

Defendant James K. Thurber now moves to dismiss this suit for lack of personal jurisdiction.  Plaintiffs have opposed this motion.

## II.   LAW

### A.  General Personal Jurisdiction

When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the court's jurisdiction over the nonresident.[11]  When a district court rules on a motion to dismiss without an evidentiary hearing, the plaintiff need only present a *prima facie* case of personal jurisdiction.[12]  At this stage, uncontroverted allegations in the complaint must be taken as true, and conflicts between the parties' affidavits must be resolved in the plaintiff's favor.[13]

To aid resolution of the jurisdictional issue, a court "may receive interrogatories, depositions or any combination of the recognized methods of discovery ... But even if the court receives discovery materials, unless there is a full and fair hearing, it should not act as a fact finder and must construe all disputed facts in the plaintiff's favor and consider

---

[9] Rec. Doc. No. 19.

[10] *Id.*

[11] *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir.1985); *Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332 (5th Cir.1982), *cert. den.*, 450 U.S. 1023, 103 S.Ct. 1275, 75 L.Ed.2d 496 (1983).

[12] *Trinity Indus., Inc. v. Myers & Assoc., Ltd.*, 41 F.3d 229, 230–31 (5th Cir.1995) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 [1985], and *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773 (5th Cir.1986), *cert. den.*, 481 U.S. 1015 (1987).

[13] *D.J. Inv., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir.1985).
35727

them along with the undisputed facts."[14]   "Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show that the assertion of jurisdiction would be unfair."[15]

"A federal district court has personal jurisdiction over a nonresident defendant to the same extent as a state court in the state in which the district court is located."[16]  Thus, personal jurisdiction over a nonresident defendant attaches only when a defendant is amenable to service of process under the forum state's long-arm statute and the exercise of jurisdiction comports with the due process clause of the fourteenth amendment.  In this case, these two queries merge into one because Louisiana's long-arm statute extends jurisdiction coextensively with the limits of the Due Process Clause of the U.S. Constitution.[17]

Where a defendant has "continuous and systematic general business contacts" with the forum state, the court may exercise "general jurisdiction" over any action brought against the defendant.[18]  Where contacts are less pervasive, a court may still exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum."[19]

---

[14] *Walk Haydel & Assoc., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008) (holding that a district court erred in requiring a plaintiff to establish more than a prima facie case even after a limited pretrial evidentiary hearing) (internal citations and quotations omitted).
[15] *Id.* at 245 (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir.1999)).
[16] *Walk Haydel*, 517 F.3d at 242.
[17] *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007); *St. Martin & Mahoney v. Patton*, 863 F.Supp. 311, 313–14 (E.D.La.1994).
[18] *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).
[19] *Id.* at 414; *Luv N' care, Ltd., v. Insta–Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006).
35727

## B.  Specific Jurisdiction

The constitutional requirements for specific jurisdiction may be satisfied by showing that the defendant has sufficient "minimum contacts" with the forum state such that imposing a judgment would not "offend traditional notions of fair play and substantial justice."[20]  The Fifth Circuit follows a three-step analysis for this determination.  First, a court must judge "whether the defendant has minimum contacts with the forum state, *i.e.*, whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there."[21]

This "minimum contacts"/"purposeful availment" inquiry is fact intensive.  No one element is decisive, and the number of contacts with the forum state is not, by itself, determinative.[22]  A single, substantial act directed toward the forum can support specific jurisdiction,[23] but even multiple contacts, if "[r]andom, fortuitous, or attenuated ... are not sufficient to establish jurisdiction."[24]  What is significant is whether the contacts suggest that the nonresident defendant purposefully availed himself of the privileges or benefits of the laws of the forum state.[25]

Second, a court considers "whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts."[26]  At this step, the proper focus in

---

[20] *Luv N' care*, 438 F.3d at 469 (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).
[21] *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002); *see also Hanson v. Denckla*, 357 U.S. 235, 250–251 (1958).
[22] *Luv N' care*, 438 F.3d at 470.
[23] *See ASARCO, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 786 (5th Cir.1990).
[24] *Moncrief Oil*, 481 F.3d at 312 (citing *Burger King*, 471 U.S. at 479 (1985)).
[25] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (citing *Hanson* 357 U.S. at 251, 254); *Hydrokinetics, Inc. v. Alaska Mech., Inc.*, 700 F.2d 1026, 1028 (5th Cir.1983), *cert. den.*, 466 U.S. 962 (1984).
[26] *Nuovo Pignone*, 310 F.3d at 378.
35727

the analysis is on the "relationship among the defendant, the forum, and the litigation."[27] This is a claim-specific inquiry, as "the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts."[28]

Finally, "[i]f the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise of jurisdiction would be unfair or unreasonable."[29]  In this inquiry, a court analyzes five factors: "(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies."[30]  "It is rare to say the assertion [of jurisdiction] is unfair after minimum contacts have been shown."[31]

### C. Minimum Contacts

Personal jurisdiction may not be avoided merely because a defendant did not physically enter the forum state.  Although territorial presence frequently will enhance a potential defendant's affiliation with a state and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communication across state lines, thus

---

[27] *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 487 (5th Cir. 2008).
[28] *Conwill v. Greenberg Traurig, L.L.P., et al.*, No. 09-4365, 2009 WL 5178310 at *3 (E.D.La. Dec. 22, 2009) (quoting *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir. 2006)).
[29] *Seiferth*, 472 F.3d at 271 (citing *Burger King*, 471 U.S. at 382).
[30] *Luv N' care*, 438 F.3d at 473; *see also, Burger King Corp.*, 471 U.S. at 476–77 (listing 7 factors).
[31] *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 615 (5th Cir. 2008)(citing *Wein Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir.1999)).
35727

obviating the need for physical presence within a state in which business is conducted. As long as a commercial actor's efforts are "purposefully directed" toward residents of the state in question, courts have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.[32]

Even so, "merely contracting with a resident of the forum state does not establish minimum contacts."[33]  "A contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."[34]

Although a single act, such as a telephone call or mailing a letter, can be sufficient to establish minimum contacts, precedent is clear that communications alone are insufficient when "the communications with the forum did not actually give rise to [the] cause of action."[35]  Rather, when communications relating to conducting business are the only contacts, courts generally require some type of "continuing obligations" between the defendant and residents of the forum, such as is found in an ongoing business relationship, to find that the defendant availed himself of the privilege of conducting business in the forum. Only then, "because his activities are shielded by 'the benefits and

---

[32] *Burger King*, 471 U.S. at 476–77.
[33] *Moncrief Oil*, 481 F.3d at 311.
[34] *Burger King*, 471 U.S. at 479 (internal citations omitted).
[35] *Wein Air*, 195 F.3d at 213; *Aviles v. Kunkle*, 978 F.2d 201, 205 (5th Cir.1992).
35727

protections' of the forum's laws, it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well."[36]

On the other hand, for claims of intentional tort, "[a] single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted."[37]  "When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment."[38]

## III.    PARTIES' ARGUMENTS

James Thurber contends he is not subject to this Court's jurisdiction for several reasons.  First, James Thurber claims he is not identified as a party to the Assignment of Cash Flow contract.  Second, James Thurber is domiciled in Indiana.  Third, James Thurber does not now, and has never, owned any property in the State of Louisiana; has never had any office, mailing address, post office box, employees, or agents who are residents or domiciliaries of the State of Louisiana; and has never paid state or municipal taxes in the State of Louisiana.  James Thurber argues that he lacks continuous or systematic contacts with the State of Louisiana such that general jurisdiction exists over him.  Likewise, James Thurber claims that, because he is not mentioned in the Assignment of Cash Flow contract, there is no transaction before the Court by which James Thurber "purposefully directed" or "deliberately engaged" in business in

---

[36] *Burger King*, 471 U.S. at 476.

[37] *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001) (citing *Brown v. Flowers Indus.*, 688 F.2d 328, 332–33 (5th Cir.1984)(holding that one long distance telephone call alleged to constitute defamation was enough to establish minimum contacts)).

[38] *Wein Air*, 195 F.3d at 213 (5th Cir.1999); *see also, Ross,* 246 Fed.Appx. 856, 859–60 (5th Cir. 2007)(deeming allegations that out of state counsel communicated false information to client in Texas alone sufficient to make prima facie case of specific personal jurisdiction).

35727

Louisiana.[39]

In opposition to James Thurber's motion, Plaintiffs provide more background surrounding the contract entered into by the parties.   Plaintiffs claim that Voyager Financial Group ("Voyager") was a broker specializing in the sale of its clients' structured settlements and annuities.   TCW was familiar with Voyager because TCW clients had done business in the past with Voyager.   In November of 2010, it was Voyager representative David Woodward who contacted Paddock to determine if any TCW clients were interested in purchasing payments due under an existing annuity for a lump sum. Woodward advised Paddock that James Thurber wanted to sell the remaining payments due under his annuity.   Plaintiffs contend that Voyager is the admitted agent for James Thurber based on James Thurber's failure to respond to Request for Admission No. 3, which sought an admission by Thurber that Voyager Financial Group acted as his agent in connection with the transaction referenced in the *Complaint*.[40]   Although James Thurber was not furnished with this request until July 29, 2016 - after the filing of his *Motion to Dismiss* but before Plaintiffs' opposition deadline – James Thurber has yet to respond to this Request for Admission.   Plaintiffs argue that, pursuant to Rule 36(a)(3) of the Federal Rules of Civil Procedure,[41] James Thurber's failure to respond by written answer or objection within thirty days constitutes an admission.   Plaintiffs also contend

---

[39] *See* Rec. Doc. No. 33-1, p. 7.
[40] Rec. Doc. No. 44-2, p. 6.
[41] "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney. A shorter or longer time for responding may be stipulated to under Rule 29 or be ordered by the court."
35727

that co-Defendant Jonathan Thurber is James Thurber's agent as established by James Thurber's power of attorney in favor of Jonathan Thurber.[42]  Plaintiffs maintain that, at all times, Voyager and its representatives, along with Jonathan Thurber, presented themselves as agents acting on behalf of James Thurber.

Plaintiffs allege that, on November 22, 2010, Woodward sent an email to Paddock in Louisiana with a schedule for the annuity payments.[43]  Thereafter, Woodward emailed Paddock a purchase request form to the Client to complete and sign, which was returned completed by TCW to Voyager via email on November 23, 2010.[44]  Plaintiffs further contend that, over the next month, Woodward and Paddock engaged in over a dozen emails and calls to Louisiana via Paddock regarding the proposed transaction.  Voyager's communications to Paddock expressly addressed the terms of the transaction along with the paperwork necessary for the annuity payments to be held by the Client's self-directed IRA.  On December 1, 2010, Voyager emailed Paddock in a copy of the annuity contract in the name of James Thurber.[45]

Plaintiffs claim that Woodward advised Paddock that James Thurber needed the funds immediately, which was the reason for the attractive sales price.  On December 3, 2016, the Client directed Self-Directed IRA Services, Inc. to wire $515,247.63 to Voyager, $437,117.35 of which was then remitted to James Thurber, to purchase the annuity payments even though James Thurber had not yet provided an executed assignment.[46]

---

[42] Rec. Doc. No. 50-3.
[43] Rec. Doc. No. 50-1, p. 3, ¶ 7; Rec. Doc. No. 50-3, pp. 5-6.
[44] *Id.*; Rec. Doc. No. 50-3, pp. 7-8.
[45] *Id.* at ¶ 8; Rec. Doc. No. 50-3, pp. 9-18.
[46] *Id.* at ¶ 9; Rec. Doc. No. 50-3, pp. 19-20.
35727

Although Paddock repeatedly requested the assignment, James Thurber never provided one.

A discussion regarding taxes was held between Paddock and Woodward in December of 2010, and Paddock ultimately requested that the transaction be rescinded; however, Plaintiffs allege that Woodward assured Paddock that James Thurber would return $85,000.00 to account for the reduced annuity payments. Paddock then provided wire instructions for the $85,000.00 and allegedly "pressed" Woodward for documentation for the assignment.[47] Plaintiffs contend that, over the next two months, Woodward and Paddock exchanged numerous emails and phone calls relating to the transaction, and James Thurber and Voyager provided nothing but excuses throughout this time period for failing to provide the requested assignment and failing to return the full $85,000.00.[48]

By February 14, 2011, Plaintiffs claim the first annuity payment was past due but not remitted. Voyager allegedly put Paddock in direct contact with Jonathan Thurber, who had power of attorney for James Thurber. The following week, Plaintiffs allege Paddock exchanged numerous emails with James Thurber through Voyager representatives and Jonathan Thurber regarding the wiring instructions for the annuity payments. Plaintiffs allege that these email communications again contained various excuses for the nonpayment of the February 2011 annuity. Plaintiffs contend that, "[b]y February 21, 2011, the Client and Paddock were in a panic, and Paddock forcefully demanded that Thurber provide the assignment and the annuity payment."[49]

---

[47] Rec. Doc. No. 50, p. 4.
[48] *Id.* Plaintiffs admit the full $85,000.00 was finally returned in January of 2011.
[49] *Id.*
35727

Voyager allegedly responded by forwarding various documents to Paddock via email to evidence the transfer:  the power of attorney by Jonathan Thurber, the Annuity in the name of James Thurber, and a document entitled "security agreement."  When Paddock inquired about the assignment, James Thurber responded through Voyager that it had been emailed to him.  However, by March 2, 2011, the payment had still not been received.  Plaintiffs allege that this pattern repeated several times in the following weeks.

Ultimately, around March 15, 2011, Thurber emailed Paddock a document entitled "Assignment of Cash Flow" to transfer payments to the Client and was signed by "Jon Thurber."  As it was represented that Jonathan Thurber had James Thurber's power of attorney, Paddock accepted this assignment and the Client signed the document.[50] Despite finally providing this assignment, Plaintiffs contend the February 2011 annuity payment was never made, and James Thurber became increasingly difficult to reach.  As the Client's unease grew, Paddock arranged to have his father, Lawrence Paddock, Sr., purchase the Client's rights in the Assignment Payments through his self-directed IRA for $500,000.00, $62,882.65 more than the Client paid James Thurber after the $85,000.00 return.[51]

Plaintiffs contend that, through his agent Jonathan Thurber, James Thurber continued to direct telephone and email communications to Paddock providing ongoing excuses for failing to remit the February 2011 payment.  Ultimately, James Thurber wired Paddock Sr. $25,000.00 on June 30, 2011 and another $38,000.00 on July 14, 2011.  The

---

[50] Rec. Doc. No. 50-1, p. 6, ¶ 16; Rec. Doc. No. 50-3, pp. 21-22.
[51] *Id.* at ¶ 17; Rec. Doc. No. 50-3, pp. 23-24.
35727

remaining $7,167.56 due was never remitted.

February 2012 was essentially a repeat of 2011. Through numerous telephone calls and emails to Paddock in Louisiana, James Thurber continued to offer excuses and assurances that the payment was coming. However, James Thurber also failed to deliver the February 2013 Assignment Payment, again offering nothing but excuses for the failure via telephone and email to Paddock in Louisiana. Finally, by letter dated April 18, 2013, Paddock demanded that Thurber remit the unpaid payments due for 2011, 2012, and 2013 within ten days. Other than a payment of $5,000.00 remitted to Paddock in May of 2013, these payments were never made. This lawsuit was filed on December 18, 2013.

## IV.  ANALYSIS

Applying the specific jurisdiction test to the facts alleged by Plaintiffs, which must be accepted by the Court as true for purposes of this motion, the Court finds that there are multiple grounds by which James Thurber has sufficient contacts with the State of Louisiana to subject him to this Court's jurisdiction. The record is replete with evidence that Voyager and Jonathan Thurber acted as agents on behalf of James Thurber. Moreover, all of the contacts with residents of the State of Louisiana were relating to the transaction that is the basis of this lawsuit. Through his agents, James Thurber directed hundreds of phone calls, texts, and emails to Louisiana residents in an effort to manage this transaction. Indeed, Thurber wired some funds to Paddock in Louisiana and likewise elicited the Client's wire of $515,247.63. Further, the allegations by Plaintiffs are sufficient to establish that Thurber's contacts with Louisiana perpetuated a fraud and breach of contract on Louisiana residents. Further, the Court finds that the alleged harm was

35727

foreseeable as the nonpayment to a Louisiana resident in a valid annuity contract clearly causes harm.

The actions taken by Thurber through his agents are more than sufficient to meet the Fifth Circuit's standards for allegations of intentional tort, which require as little as a single contact when the information in that contact is fraudulent and gives rise to a plaintiff's claim.[52] Although Thurber denies his "identification" on any document presented in this case, at this stage, Plaintiffs need only present a *prima facie* case of personal jurisdiction; uncontroverted allegations in the complaint must be taken as true, and conflicts between the parties' affidavits must be resolved in Plaintiffs' favor.[53]

In this matter, Thurber did not submit an affidavit or support for his allegations, and he appears from the record to have failed to respond to Plaintiff's jurisdictional discovery requests.  Additionally, as Plaintiffs have noted, Thurber does not deny his participation in this transaction; rather, he claims that he was not listed as a party on the document. Paddock's affidavit, however, which much be accepted by the Court and has not been contradicted by Thurber, asserts that Thurber made the agreement to assign the annuity payments through Jonathan Thurber who had James Thurber's power of attorney. Additionally, there is no dispute that annuity payments that were the subject of the assignment were owned by James Thurber.

Therefore, the Court finds that the established contacts by Thurber to residents in the State of Louisiana to contract for the sale of his annuity payments, and the subsequent

---

[52] *See Wein Air*, 195 F.3d at 213 ("When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment.").
[53] *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985).
35727

voluminous contacts relating thereto, are sufficient to satisfy a showing that Thurber had "minimum contacts" with the State of Louisiana, and he "purposefully availed himself" of the privileges of conducting activities in Louisiana.  It is also clear that Plaintiffs' cause of action arises out of these contacts by Thurber with Louisiana residents.  Indeed, every contact alleged relates to the contract to sell annuity payments which is the basis for this lawsuit.

Finally, having established a *prima facie* case for jurisdiction, the Court finds that the burden shifted to Thurber to establish how this Court's exercise of jurisdiction over him would be unfair or unreasonable.  Thurber did not even address this issue or provide any argument or evidence to the Court establishing that his defense of this lawsuit in this Court would be unfair or unreasonable.  Thurber apparently rests his entire motion on the facts that he resides in Indiana and is not named in the Assignment of Cash Flow.  This is wholly insufficient to defeat Plaintiffs' assertion of personal jurisdiction.  Hence, upon consideration of the fairness factors discussed above,[54] the Court finds that the balance of those factors overwhelmingly favors a finding of jurisdiction.  Thurber has not shown how this Court's exercise of jurisdiction over him would be burdensome; the State of Louisiana's interests in protecting its citizens from fraud is clearly present as is the Plaintiffs' interest in securing relief; and the interests of justice and the effective administration of justice among the States is served by the exercise of jurisdiction in this

---

[54] *See* n. 30, *supra*.  (In this inquiry, a court analyzes five factors: "(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies.").
35727

matter.

The Court would also advise Thurber that, having found that he is subject to the jurisdiction of this Court, he is required to appear for Court-ordered hearings, conferences, and depositions, to respond to pleadings, and to comply with the Federal Rules of Civil Procedure and the Local Rules of this Court.  The record reflects that Plaintiffs have asserted that Thurber failed to respond to written discovery and failed to appear for his noticed deposition.  The record also reflects that Thurber failed to appear for a Court-ordered telephone status conference before the Magistrate Judge, perhaps on the basis that he believed the Court lacked jurisdiction over him or because he no longer has counsel representing him.  Having resolved this issue and found that jurisdiction is proper in this case, Thurber is hereby advised that his participation in this case is not optional.  Thurber has been provided time to retain counsel, and if he fails to do so, his participation is still required in this matter as a *pro se* litigant.  Any future failures by Thurber to participate fully in this matter may be met with sanctions.

## V.    CONCLUSION

For the reasons set forth above, the Defendant James Thurber's *Motion to Dismiss* is DENIED.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>October 31, 2016</u>.

_____
**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

35727